**John DOE, Steve Morris, on their own behalf and on behalf of those similarly situated, Plaintiffs,**

v.

**PROSECUTOR, MARION COUNTY, INDIANA, et al., Defendants.**

**No. 1:08–cv–0436–DFH–TAB.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 24, 2008.

Kenneth J. Falk, ACLU of Indiana, Indianapolis, IN, for Plaintiffs.

David A. Arthur, Office of Indiana Attorney General, Indianapolis, IN, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID F. HAMILTON, Chief Judge.

In 2008 the Indiana General Assembly enacted Public Law 119, which amended many of the requirements imposed upon those persons who must register with the state as sex offenders and violent offenders. This case presents a challenge to one of the new requirements as it would apply to those who have completed their sentences and are no longer on parole, probation, or any other form of court supervision. Under the new statute, set to take effect on July 1, 2008, all those who must register must also consent to the search of their personal computers or devices with internet capability at any time, and they must consent to installation on the same devices, at their expense, of hardware or software to monitor their internet use. Ind. P.L. 119–2008 § 6 (2008) (SEA 258), to be codified in Ind.Code § 11–8–8–8(b) (effective July 1, 2008). Failure to "consent" to these measures is itself a felony.

Pursuant to the parties' stipulation, the court certified a plaintiff class under Rule 23(b)(2) of the Federal Rules of Civil Procedure. Plaintiffs are a class of "all persons, current and future, who are required to register as sex or violent offenders pursuant to Indiana law and who are not currently on parole or probation or court supervision." Plaintiffs allege that the new law violates their rights under the Fourth Amendment to the United States Constitution prohibiting unreasonable

searches and requiring probable cause for issuance of a warrant. Plaintiffs seek a declaration that the new consent-to-search requirements are unconstitutional and an injunction against their enforcement. The court heard argument on a stipulated factual record on May 30, 2008, and now states its findings of fact and conclusions of law pursuant to Rules 52 and 65 of the Federal Rules of Civil Procedure. Substance shall govern whether an item is deemed a finding of fact or conclusion of law.

The plaintiff class consists of people who have committed serious crimes and have been punished for those crimes. They have returned to society, and they have rights under the United States Constitution. As explained in detail below, the plaintiff class may bring this pre-enforcement challenge to this new law as applied to these class members. The new law forces an unconstitutional choice upon these plaintiffs. They must choose now between committing a new crime by refusing to consent and giving up their Fourth Amendment rights to privacy and security in their homes, their "papers," and their effects. The unprecedented new law, however well-intentioned it may be, violates the Fourth Amendment rights of the plaintiff class, who have completed their sentences and are no longer on probation, parole, or any other kind of court supervision. The court is issuing a declaratory judgment stating that the consent-to-search requirements in Indiana Code § 11–8–8–8(b) may not be applied to members of the plaintiff class.

## I. *The Indiana Sex and Violent Offender Registry*

Like many states, Indiana has established a sex and violent offender registry, and the information is available on a public website. Ind.Code § 36–2–13–5.5. The law requires those convicted of a wide range of offenses to register. The offenses include rape, criminal deviate conduct, child molesting, child exploitation, vicarious sexual gratification, child solicitation, child seduction, sexual misconduct with a minor as a Class A, B, or C felony (with certain exceptions), incest, sexual battery, kidnaping if the victim is less than 18 years old, some criminal confinement of a person under 18 years old, possession of child pornography, promoting prostitution, human trafficking and promoting human trafficking if the victim is less than 18 years old, sexual trafficking of a minor, murder, voluntary manslaughter, an attempt to commit a listed offense, and any substantially equivalent crime under the laws of another jurisdiction, and certain juvenile offenses. Ind. Code § 11–8–8–5.1. Some sex or violent offenders must register for the rest of their lives. Ind.Code § 35–38–1–7.5. Others must register until ten years have passed after the later of the offender's release from prison, placement in a community transition program or community corrections program, or placement on parole or probation. Ind.Code § 11–8–8–19(a).

A person who is required to register must register in every county in Indiana in which he owns real property, resides, is employed, or is a student. Ind.Code § 11–8–8–7(a)–(e). If the location of his residence, employment, or school changes, the person must report the changes in person to the local law enforcement authority. Ind.Code § 11–8–8–11. The sex or violent offender must report in person to the local law enforcement authority to register and be photographed at least once per year, or at least every ninety days if he has been designated a sexually violent predator. Ind.Code § 11–8–8–14. To verify the residence of the sex or violent offender, local law enforcement must personally visit each sex or violent offender at his residence at

least once per year, or at least every ninety days if the person is designated a sexually violent predator. Ind.Code § 11–8–8–13(a). If the person appears not to reside at the location, local law enforcement "shall immediately notify" the Indiana Department of Correction and the county prosecuting attorney. Ind.Code § 11–8–8–13(b).

Under current law, the registry must include a recent photograph of the offender, the home address, and other information required under Indiana Code § 11–8–8–8. The offender must also provide a physical description, information about the vehicles he uses, and employer and/or school information. Beginning July 1, 2008, the registrant must also provide any electronic mail address, instant messaging user name, electronic chat room user name, or social networking web site user name that the registrant uses or intends to use. Ind. P.L. 119–2008 § 6 (2008) (SEA 258), to be codified in Ind.Code § 11–8–8–8(a)(7) (effective July 1, 2008).[1] Plaintiffs do not challenge any of these requirements, including the new requirements in section 8(a)(7) to report electronic mail addresses, user names, and the like.

The 2008 legislation also includes a new requirement, known as "section 8(b)," which plaintiffs challenge under the Fourth Amendment:

> (b) If the sex or violent offender registers any information under subsection (a)(7) [i.e., electronic mail addresses, user names, etc.], the offender shall sign a consent form authorizing the:

> (1) search of the sex or violent offender's personal computer or device with Internet capability, at any time; and

> (2) installation on the sex or violent offender's personal computer or device with Internet capability, at the sex or violent offender's expense, of hardware or software to monitor the sex or violent offender's Internet usage.

Ind. P.L. 119–2008 § 6 (2008) (SEA 258), to be codified in Ind.Code § 11–8–8–8(b) (effective July 1, 2008). One curious feature of the statute is that it does not say whom the consent form authorizes to conduct the searches and monitoring.

A knowing or intentional failure to comply with the registration requirements is a felony under Indiana law. Ind.Code § 11–8–8–17. A knowing or intentional failure to provide the consent required by section 8(b) therefore amounts to a felony under Indiana law.[2]

## II. *The Parties*

The plaintiffs are a class of "all persons, current and future, who are required to register as sex or violent offenders pursuant to Indiana law and who are not currently on parole or probation or court supervision." The plaintiff class was certified by stipulation of the parties under Rule 23(b)(2) of the Federal Rules of Civil Procedure because the defendant prosecutors (and the State of Indiana) have acted or refused to act on grounds that apply generally to the plaintiff class, so that injunctive relief or declaratory relief would be appropriate for the class as a whole.

---

1. Key terms are defined in new sections, Indiana Code §§ 11–8–8–1.2, –1.4, –1.6, and –1.8.

2. The same public law that added section 8(b)'s requirements for all persons who must register also added nearly identical consent-to-search provisions for sex offenders who are paroled (section 10, amending Indiana Code § 11–13–3–4(g)(2)), or who are put on probation (section 16, amending Indiana Code § 35–38–2–2.2).

Plaintiffs John Doe and Steve Morris are class representatives and adult residents of Indiana. They are listed on the sex and violent offender registry and must register for the rest of their lives. Both have been released from prison. They are not currently on probation, parole, supervised release, or any other form of court supervision.

Doe owns his own business and operates it out of his home. He has an electronic mail address and constantly uses his computer in his business. He also owns a cellular telephone with internet capability. Doe is aware of the new law's requirements in section 8(b). He realizes that he will be required to give permission to unspecified law enforcement authorities to enter his home at any time and to search his computer and telephone at any time, all without a warrant. He also will be required to pay for software or hardware to allow other unspecified law enforcement authorities to search his computer and monitor his internet use.

Doe does not want to comply with section 8(b) because it will remove his privacy in his own home. Also, his computer contains a great deal of private information concerning his clients and his business dealings, including information that his clients have sent him in confidence and that they consider proprietary. He has formal non-disclosure requirements with clients and may not disclose information to other persons who have not also signed non-disclosure agreements. Neighbors know that Doe is listed on the registry, but he believes his clients do not know. Doe does not want to tell clients he is on the registry because of his fear that he will lose business and suffer financially. Doe's computer also contains confidential information personal to Doe, including personal banking information and communications with his attorney.

Morris lives with his wife. He owns a personal computer at home. He has an electronic mail address and owns an internet-capable cellular telephone. Morris does his family's banking over the internet with his personal computer, which thus contains his financial and banking records.

Morris also does not want to comply with section 8(b) because it will remove his and his wife's privacy in their home. He does not want to lose his privacy in his home and effects, and he also does not want to have to install and pay for software and/or hardware that would allow other persons to monitor his computer use.[3]

---

3. The court raised a question at the hearing about how section 8(b) would apply to a spouse's computer. Defendants took the position that section 8(b)'s application to the "offender's personal computer or device" means that it applies only to a personal computer or device legally owned by the offender. If his wife or house-mate or employer owned the personal computer or device, defendants suggest, then section 8(b) does not apply and the offender's use of the personal computer or other device is not subject to search or monitoring.

This interpretation would probably disappoint the Indiana General Assembly. It would apply not only to section 8(b) but also to the new, parallel provisions of mandatory conditions of parole and probation for sex offenders. Defendants' interpretation would make it astonishingly easy for sex and violent offenders to evade the oversight the statute seeks to impose. (This interpretation would also open up lots of intriguing questions that police officers might have to answer in the middle of the night as they enter to search the offender's personal computer or other device. How should marital property be treated? What if the computer is leased? Or owned by an employer? Would the police be authorized to search for a sales receipt or bill of sale? Would they be required to complete that search, and even seek a judicial determination, before carrying out their search?) While there may still be room for interpretation at the edges, the court expects that the

Morris did not finish his criminal sentence easily. He must register because he was convicted of two counts of child molesting in 1996. In 1998, while he was on probation, he was charged with sexual misconduct with a minor, and in 1999 he was convicted of that offense and his probation was revoked. Morris was paroled in 2001. In 2003, while still on parole, he was arrested for residential entry and violation of a protective order. In 2004, he was given a pre-trial diversion agreement for both of those charges. In 2005, his parole was revoked because he had violated conditions of parole by using marijuana, entering a package liquor store, renting pornographic movies, and searching for and observing (adult) pornography on the internet. Morris was paroled again on November 12, 2005, and was finally discharged from his sentence on August 24, 2006.

The plaintiff class has named as defendants all prosecuting attorneys in the state of Indiana, as well as the mayor of Indianapolis. Plaintiffs seek injunctive relief against enforcement of section 8(b) and a declaratory judgment that section 8(b) is unconstitutional.

## III. *Ripeness of this Pre–Enforcement Challenge*

The defendants raise several arguments that seek to avoid a decision on the merits of the Fourth Amendment claim. The first of these affects the court's subject matter jurisdiction. Defendants argue that the case is not yet ripe for adjudication because section 8(b) has not yet taken effect, because no searches have been carried out under its authority, and because many details remain to be worked out for how section 8(b) should be implemented. The court rejects these arguments and

Indiana courts would apply section 8(b) to personal computers or other devices that the registered offender actually uses with the reg-

finds that these plaintiffs' challenge to section 8(b) is ripe for adjudication. The plaintiffs have presented a sufficiently concrete and specific challenge. Without relief at this time, plaintiffs face significant hardships and loss of the security and privacy protected by the Fourth Amendment. Varying details of enforcement mechanisms would not affect the basic Fourth Amendment issues.

### A. *Factors for Assessing Ripeness*

■ Federal courts may not render advisory opinions that address abstract legal questions. *United Public Workers v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Article III of the Constitution gives federal courts jurisdiction to decide only actual cases or controversies. *Wisconsin's Environmental Decade, Inc. v. State Bar of Wisconsin,* 747 F.2d 407, 410 (7th Cir.1984), citing *Poe v. Ullman,* 367 U.S. 497, 502, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), and *Muskrat v. United States,* 219 U.S. 346, 354–57, 31 S.Ct. 250, 55 L.Ed. 246 (1911). Under the Declaratory Judgment Act, 28 U.S.C. § 2201, federal courts may issue declaratory judgments only in cases of actual controversy.

■ No precise test exists to distinguish between an abstract question and a justiciable case or controversy, but well-established principles provide guidance. *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 297–98, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *J.N.S., Inc. v. Indiana,* 712 F.2d 303, 305 (7th Cir.1983). The case or controversy requirement prevents federal courts from rendering judgments that are unnecessary to resolve a real dispute or in cases in which a court would have difficulty reaching a competent

istered email addresses, user names, etc., regardless of the legal ownership of the devices in question.

decision. *Illinois v. General Electric Co.,* 683 F.2d 206, 210 (7th Cir.1982). The lack of an immediate conflict could make it difficult for a court to make factual findings and could also reduce the parties' incentives to argue the case vigorously. *Id.* The basic question the court must ask is whether the contentions of the parties present "a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301, quoting *Railway Mail Association v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945). It is insufficient that the controversy may arise in the future; the controversy must be immediate. *Wisconsin's Environmental Decade, Inc.,* 747 F.2d at 411; *J.N.S., Inc.,* 712 F.2d at 305.

In *Abbott Laboratories v. Gardner,* the Supreme Court laid out the basic criteria for pre-enforcement ripeness in the context of a claim challenging the validity of regulations promulgated by the Commissioner of Food and Drugs. 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (holding ripe for judicial review an action seeking injunctive relief and declaratory judgment that regulations were invalid), overruled on other grounds, *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Court stated that the ripeness inquiry requires an evaluation of two factors: (a) the fitness of the issues for judicial decision and (b) the hardship to the parties of withholding court consideration. 387 U.S. at 149, 87 S.Ct. 1507. In determining that the claim was fit for judicial decision, the Court noted that the legal issue did not depend on additional factual development and that the regulations constituted final agency action. *Id.* at 149–52, 87 S.Ct. 1507. In determining the hardship the parties would suffer if the courts were to withhold consideration, the Court considered whether the impact of the regulations on the plaintiffs was direct and immediate, including whether the regulations had a direct effect on the plaintiffs' day-to-day business operations. *Id.* at 152, 87 S.Ct. 1507. The Court found that the claim was ripe because the Commissioner of Food and Drugs expected immediate compliance with the regulations, which exposed the plaintiffs to serious criminal and civil penalties if they failed to comply promptly. *Id.* at 152–53, 87 S.Ct. 1507.

The Supreme Court has provided guidance for applying the ripeness factors from *Abbott Laboratories* to cases in which a plaintiff contends that a criminal statute affects his ability to exercise constitutional rights. In *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), police officers threatened the plaintiff with arrest for violating Georgia's criminal trespass statute if he did not cease distributing handbills that criticized the United States' involvement in Vietnam. The plaintiff sought a declaratory judgment that enforcement of the criminal trespass statute against him would violate his First and Fourteenth Amendment rights. The Court held that despite the fact that the statute had not been enforced against the plaintiff, the threat of prosecution could not be characterized as "imaginary or speculative" and was sufficient to present an actual controversy. *Id.* at 459, 94 S.Ct. 1209. Police officers had threatened the plaintiff with arrest on two occasions and had arrested one of his companions for distributing similar handbills. "In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Id.* at 459, 94 S.Ct. 1209.

In *Babbitt v. United Farm Workers National Union,* the plaintiffs sought

an injunction and a declaratory judgment that various portions of an Arizona agricultural labor law were unconstitutional, including a provision that established criminal penalties for employers who committed unfair labor practices. Though the criminal penalty had never been enforced, the Supreme Court held that the issue was ripe because there was a credible threat of prosecution. 442 U.S. at 302, 99 S.Ct. 2301. "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Id.* at 298, 99 S.Ct. 2301, quoting *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

The Supreme Court has recently explained that claims challenging the constitutionality of a state statute can be ripe even absent an imminent threat of prosecution under the challenged statute. In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), the Court held that a private patent licensee could seek declaratory relief on patent validity and infringement without actually violating the license agreement and risking loss of the license. In explaining its decision, the Court drew on cases holding that parties could challenge the validity of criminal laws without actually violating them and risking criminal punishment:

> Our analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

549 U.S. at ——, 127 S.Ct. at 772 (emphasis in original). The Court in *MedImmune* explained that *Steffel v. Thompson* presented a ripe controversy for declaratory relief because the plaintiff had eliminated the imminent threat of harm (criminal prosecution) by not doing what he claimed a constitutional right to do. His decision not to exercise his rights did not defeat subject matter jurisdiction because "the threat-eliminating behavior was effectively coerced." *Id.* The Court in *MedImmune* endorsed the *Abbott Laboratories* formulation: "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *Id.*, quoting *Abbott Laboratories*, 387 U.S. at 152, 87 S.Ct. 1507; see also *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (finding ripe a claim by high school biology teacher seeking injunction and declaratory judgment that state statute prohibiting teaching of evolution and subjecting violators to criminal prosecution and termination from teaching positions violated the First Amendment, even though there had been no threat of enforcement against her).

Similarly, the Seventh Circuit has recognized that the mere existence of a law sometimes can serve as a threat that would in and of itself make ripe a claim challenging the constitutionality of the law. *Schmidling v. City of Chicago*, 1 F.3d 494, 499–500 (7th Cir.1993), citing *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301, *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 8–10, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), *Epperson*, 393 U.S. at 98–102, 89 S.Ct. 266, and *Kucharek v. Hanaway*, 902

F.2d 513, 516 (7th Cir.1990) (holding ripe a claim by sellers of sexually explicit materials that obscenity statute that had not been enforced violated First Amendment based on plaintiffs' assertion that they were deterred from selling materials because of fear of prosecution).

■ Drawing from these and other Supreme Court decisions, the Seventh Circuit has identified three factors that a court should consider to determine whether a case is ripe when the plaintiff seeks a declaration that a state law violates the United States Constitution: (1) the magnitude of the threat that the challenged law will actually be enforced against the plaintiff; (2) the nature of the consequences risked by the plaintiff if the law is enforced against him or her; and (3) whether the plaintiff has actually been forced to alter his or her conduct as a result of the state law. *Wisconsin's Environmental Decade, Inc.*, 747 F.2d at 411. In this case, these factors weigh decisively in favor of considering the merits of these plaintiffs' challenge to section 8(b), primarily because the law is structured to force members of the plaintiff class to "consent" to unspecified intrusions into their privacy, security, and Fourth Amendment rights.

### B. *Magnitude of the Threat of Enforcement*

It is almost certain that a person on the registry who elects not to sign the consent form will be detected. Section 8(b) is one small part of a complex set of registration requirements for sex and violent offenders. A person who is a sex or violent offender must register in every county in Indiana in which he owns real property, resides, is employed, or is a student. Ind.Code § 11–8–8–7(a). If the location of his residence, employment, or school changes, he must report the changes in person to the local law enforcement authority. Ind.Code

§ 11–8–8–11. He must report in person to the local law enforcement authority to register and be photographed at least once per year, or at least every ninety days if he has been designated a sexually violent predator. Ind.Code § 11–8–8–14. These face-to-face visits provide opportunities for law enforcement to insist that members of the plaintiff class sign the consent forms required by section 8(b). To verify the residence of the sex or violent offender, local law enforcement also must personally visit each sex or violent offender at his residence at least once per year, or at least every ninety days if the person is designated a sexually violent predator. Ind.Code § 11–8–8–13(a). Failures must be reported immediately to the prosecuting attorney. Ind.Code § 11–8–8–13(b). With this near constant interaction with law enforcement, it is hard to imagine that a sex or violent offender who refused to sign the consent form would go undetected.

It appears highly likely that a class member who refused to give consent to searches under section 8(b) would be prosecuted. The defendants' arguments about the importance of these new requirements and the need to monitor persons on the sex and violent offender registry (discussed below) indicate that prosecutors are unlikely to overlook what would have to be seen as deliberate refusals to comply with the new statute. In general, a court may assume that a statute will be enforced absent an affirmative statement from the government that it will not be enforced. See *Babbitt*, 442 U.S. at 302, 99 S.Ct. 2301 (finding ripe a pre-enforcement challenge to criminal penalties for employers that commit unfair labor practices because state had not disavowed intention of invoking the criminal penalty); see also *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (finding ripe a pre-

enforcement challenge to state law regulating sales of sexually explicit materials in stores accessible to minors; state had not said the new law would not be enforced, and Court had no reason to assume it would not be enforced). The defendants in this case have not disavowed any intention to use the new criminal penalty for refusing to consent to searches of the plaintiffs' computers and other devices.

## C. *Nature of Consequences Risked*

The consequences that plaintiffs must risk weigh in favor of deciding this case on the merits. The members of the plaintiff class committed serious crimes. The case brings to mind Justice Frankfurter's comment: "It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting). But these plaintiffs paid the price for those crimes and completed their criminal sentences.

Each plaintiff must make a decision in the next few days or weeks whether to comply with section 8(b). Section 8(b) requires him to give written consent to someone, the statute does not say who, who may *enter his home at any time* to search his personal computer and other devices. Section 8(b) poses a choice. If he refuses, he commits a felony and subjects himself to a new round of criminal prosecution and punishment. If he complies with the law, then he effectively abandons his rights under the Fourth Amendment. He cannot feel secure in his home, his modern "papers," and his effects.

■ Thus, at stake here are consequences that are fundamental to our Constitution. The Fourth Amendment embodies the conviction of our Nation's founders that there must be "a right of personal security against arbitrary intrusions by official power." *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion of Stewart, J.). "Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. That safeguard has been declared to be 'as of the very essence of constitutional liberty' the guaranty of which 'is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen....'" *Ker v. California*, 374 U.S. 23, 32, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), quoting *Gouled v. United States*, 255 U.S. 298, 304, 41 S.Ct. 261, 65 L.Ed. 647 (1921). In light of these significant stakes, plaintiffs should not be required to risk their liberty again by violating the new law and facing criminal prosecution.

## D. *Whether Plaintiffs Will Be Forced to Alter Conduct*

■ The plaintiffs have made a sufficient showing that the new law will force them to alter their conduct, weighing in favor of this pre-enforcement challenge. Defendants argue that it is not certain that searches will ever be performed based on consents obtained under section 8(b). That argument misses the most important point—the legitimate fears the plaintiffs have that the statute will be used—and the immediate effects those fears have on them and their privacy and activity, regardless of how often the government actually uses the powers conferred by section 8(b). Valid consent to a search is a well-established exception to the warrant requirement under the Fourth Amendment. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Davis v. United States*, 328 U.S. 582, 593–94, 66 S.Ct. 1256,

90 L.Ed. 1453 (1946). By requiring members of the plaintiff class to give "consent" to entry into their homes at any time and to searches of their computers and other devices, section 8(b) requires members of the plaintiff class to surrender their constitutionally protected privacy in their homes and daily lives that they have enjoyed through June 30, 2008.

Those effects are best understood from the perspective of the plaintiffs. For example, plaintiff Doe uses his personal computer in his business. He keeps confidential information on it. Section 8(b) tells him that he cannot give clients any reasonable assurance that confidential information that they send him will remain confidential. The new law does not identify who may carry out the searches, and it puts no limits on the scope of the search. Nor does it limit the use of information, let alone give any person the opportunity to object to disclosure or use of the information. If Doe must give consent and wait to challenge the law, should he tell his clients that their information may be compromised, and thus risk irreparable harm to his business? Or should he stay silent and hope that his computer is not searched and that no harm will be done? Should he continue to use his computer for conducting his personal business, or should he use some other form of communication not covered by section 8(b)?

Or consider plaintiff Morris or any other unnamed member of the plaintiff class. If he signs the consent, he and his wife cannot feel secure at home. The prospect of searches "at any time" without a search warrant, without probable cause, and without even reasonable suspicion of wrongdoing, would dramatically impair the privacy these plaintiffs have the right to enjoy in their own homes under the Fourth Amendment. It is reasonable to expect such impairment of privacy to have a chilling effect on the plaintiffs' daily lives in their own homes. And it is cold comfort to suggest that they wait until their homes and computers are actually searched before bringing constitutional challenges.

In other words, by its presence in the Indiana Code, and by the requirement that plaintiffs give written consent when they register, section 8(b) will affect the plaintiffs' conduct as soon as it goes into effect. Unless the court allows this pre-enforcement challenge, plaintiffs must choose between risking another criminal prosecution for refusing to comply, or accepting the immediate impairment of their ability to enjoy their constitutional right of privacy under the Fourth Amendment. Those effects are now imminent, and the plaintiffs are entitled to seek injunctive and declaratory relief from those effects.

■■■■■ At the hearing, the defendants suggested that these effects are not substantial because no one in our society can ever have absolute assurances of privacy. Defendants point out, for example, that a court might issue a search warrant for plaintiff Doe's computer, thus exposing his clients' and his confidential information to scrutiny by police officers. That much is true, but the logic of the argument runs contrary to nearly 220 years of American constitutional law. The Fourth Amendment protects the privacy of Americans by placing a neutral judicial officer between the police and the privacy of the home and papers (and now computers), by requiring a warrant based on probable cause, and by requiring that the warrant be specific. See *United States v. United States District Court for Eastern District of Michigan*, 407 U.S. 297, 317, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); accord, *Coolidge*, 403 U.S. at 449, 91 S.Ct. 2022 ("When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or

Government enforcement agent."), quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). To suggest that the removal of that neutral judicial officer as a barrier does not significantly impair a citizen's privacy in his home is to imply that the warrant requirement is no big deal, that it imposes no meaningful restraints upon law enforcement. The "most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption ... that the exigencies of the situation made that course imperative.'" *Coolidge*, 403 U.S. at 454–55, 91 S.Ct. 2022 (footnotes and citations omitted).

### E. *Pre–Enforcement Challenges Under the Fourth Amendment*

The defendants argue that the Fourth Amendment is not implicated until there has been an actual search, so that *any* pre-enforcement claim based on the Fourth Amendment cannot be ripe. The court is not persuaded that Fourth Amendment rights are so vulnerable to threats that stop short of actual warrantless searches. It is true that many cases addressing pre-enforcement challenges to laws involve First Amendment rights. See, *e.g.*, *Steffel*, 415 U.S. 452, 94 S.Ct. 1209; *Epperson*, 393 U.S. at 100, 89 S.Ct. 266; *Kucharek*, 902 F.2d at 515; *Wisconsin's Environmental Decade*, 747 F.2d at 409. But other cases allowing pre-enforcement challenges have arisen in many other contexts. *Abbott Laboratories v. Gardner* allowed a pre-enforcement challenge to regulations governing drug labeling. 387 U.S. at 153, 87 S.Ct. 1507. Even in the First Amendment

cases, the Supreme Court has carefully addressed the ripeness issue in terms much broader than the First Amendment, framing the question in terms of whether the challenged law affects *any* constitutionally protected interest. See, *e.g.*, *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301 ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."); *Steffel*, 415 U.S. at 459, 94 S.Ct. 1209 ("it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights").

In addition, the few cases that have considered pre-enforcement challenges based on the Fourth Amendment have not applied a blanket rule but have used the factors discussed above: the magnitude of the threat of enforcement and the nature of the harm that would be caused by enforcement. In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, the plaintiffs brought a pre-enforcement challenge to a local ordinance that stated that a business must obtain a license before it could sell any items that were designed or marketed for use with illegal cannabis or drugs. 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (holding that ordinance was not void for vagueness or overbreadth). One provision of the ordinance required businesses that sold these items to keep a record of each sale of a regulated item, including the name and address of the purchaser, which would be open to police inspection. The Court of Appeals had expressed concern about potential Fourth Amendment problems resulting from this provision because customers

could be subjected to police scrutiny on the basis of the purchase of a legal item. The Supreme Court elected not to address the Fourth Amendment issues that had been raised, stating: "In a pre-enforcement challenge it is difficult to determine whether Fourth Amendment rights are seriously threatened. [Plaintiff] offered no evidence of a concrete threat below." *Id.* at 504 n. 22, 102 S.Ct. 1186.

Though the *Hoffman Estates* Court did not find that particular claim to be ripe, it did not adopt a blanket rule against any and all pre-enforcement challenges based on the Fourth Amendment. Instead, the Court's reasoning plainly left open the possibility that a plaintiff could offer evidence of a concrete threat of enforcement and could bring a pre-enforcement challenge to a statute based on the Fourth Amendment. The Court also noted that the case involved economic regulation, where the government may adopt more detailed rules or regulations that could narrow the scope of the law. *Id.* at 504, 102 S.Ct. 1186.

In this case, the state statute requires the plaintiffs to give blanket consent that effectively exempts their homes and computers from the Fourth Amendment, affecting not merely economic activity but core privacy interests in the home. In addition, the legal issue does not depend on further factual development that would better await further experience under the new law. These plaintiffs' Fourth Amendment challenge is therefore ripe for decision.

In *United Transportation Union v. Foster*, 205 F.3d 851, 858 (5th Cir.2000), the Fifth Circuit held that a pre-enforcement challenge to Louisiana railroad safety laws based on the Fourth Amendment was not ripe. The Louisiana law permitted police officers to test a railroad employee as part of a criminal investigation following a collision if they had "reasonable grounds" to believe that the person operating the locomotive was under the influence of drugs or alcohol. The court explained that the law would come into play only if a train were in a collision in Louisiana and a law enforcement officer had "reasonable grounds" but not probable cause to believe that alcohol or drugs were a factor in the collision, a situation that the court described as "a mountain of conjecture and speculation." *Id.* The court noted that it was reluctant to grant pre-enforcement review of the Fourth Amendment claim because of the slight harm that the railroad employees challenging the statute would suffer if the statute were enforced. The statute expressly permitted railroad employees to refuse a police officer's request to take a toxicology test, in which case the officer had the authority only to report the refusal to the Department of Transportation. The speculative threat of enforcement, combined with the minimal harm that would be caused by the enforcement of the statute, convinced the court that the case was not ripe for judicial review.

The plaintiffs here, by contrast, face a credible, concrete prospect of enforcement of section 8(b) due to their close contact with law enforcement, their existing registration obligations, and the legislature's decision to require broad "consent" to searches. In contrast to the railroad employees in *Foster*, these plaintiffs risk serious consequences in the event that section 8(b) is enforced: either prosecution for a felony or the immediate loss of their expectation of privacy in their homes, papers and effects. Absent declaratory or injunctive relief, the members of the plaintiff class must make their decisions in the next few days or weeks. They are entitled to seek relief now to avoid having to make that choice.

## IV. *"As Applied" or "Facial" Challenge?*

Defendants also argue that the plaintiffs have brought a "facial" challenge to section

8(b) and that the facial challenge should be rejected because, in the words of *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), a plaintiff can succeed in a "facial" challenge only by establishing "that no set of circumstances exists under which the Act would be valid." In other words, the plaintiffs would need to show "that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. ——, ——, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008). Defendants argue that section 8(b) must survive any facial challenge because its consent-to-search requirements could be applied to parolees and probationers without violating their Fourth Amendment rights. See *Samson v. California*, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (allowing suspicionless search of parolee by police officer on a public street where state law required parolees to consent to such searches); *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (allowing warrantless search of probationer's home based on reasonable suspicion and probationer's consent to warrantless searches as condition of probation).

The plaintiffs' complaint seeks broad injunctive relief, apparently against any enforcement of section 8(b), thus opening up plaintiffs' challenge to the *Salerno* argument. But the court need not act so broadly as to say that section 8(b) cannot be applied to anyone at all. See, *e.g., Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (reversing complete invalidation of state statute:

"Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact.") (citations omitted).

In this case, plaintiffs do not challenge the application of section 8(b) to persons on parole, probation, or other court supervision, and their Fourth Amendment theory does not reach so far. Plaintiffs' theory is that the plaintiff class members have completely finished their criminal sentences, so that they cannot be forced to consent to surrender their Fourth Amendment rights. Under plaintiffs' theory, in other words, section 8(b) may not be applied to members of the plaintiff class. A declaratory judgment or injunction against section 8(b) as applied to members of the plaintiff class can provide these plaintiffs with complete and effective relief. See *Ayotte*, 546 U.S. at 331–32, 126 S.Ct. 961 (lower courts could issue declaratory judgment and injunction prohibiting statute's unconstitutional application, without declaring statute entirely void). Accordingly, this case is better conceived as a challenge to any application of the statute to this plaintiff class, leaving issues regarding persons in different situations for another day. See *Washington State Grange*, 552 U.S. at ——, 128 S.Ct. at 1191 (exercising judicial restraint in a facial challenge avoids unnecessary pronouncement on constitutional issues and premature interpretations where constitutional application might be cloudy).[4]

---

4. Based on close observation of the Supreme Court's work, some commentators have concluded that the distinction between "facial" and "as applied" constitutional challenges is not helpful. Instead, it is more useful and accurate to focus on specific constitutional doctrines and standards that apply to the particular case, and to shape the relief based on those more specific standards. See, *e.g.,* Richard H. Fallon, *As–Applied and Facial Chal-*

## V. Merits of the Fourth Amendment Claim

Turning to the merits of the plaintiffs' Fourth Amendment claim, the court concludes that section 8(b), as applied to the plaintiff class of persons who no longer are under any form of court supervision, will violate the plaintiffs' Fourth Amendment rights. The parties have not cited, and the court has not found, any American law that attempts to authorize such a broad intrusion on personal privacy and security, without a warrant, probable cause, or even reasonable suspicion, for persons not in prison or subject to parole, probation, or other court supervision.

### A. Entry into the Home

█ Section 8(b) cuts into the heart of the Fourth Amendment—privacy in the home. Section 8(b) requires the members of the plaintiff class to consent to the search of their personal computers or internet-capable devices "at any time." Even if law enforcement officers chose to wait outside the home to demand the right to search a registrant's portable devices (the statute is silent on the point), personal computers will most often be inside the home. By granting unlimited access to these devices, the Indiana legislation crosses the most fundamental boundary under the Fourth Amendment, and dispenses with the warrant requirement. The ability of the individual to retreat into his home, and there to be free from unreasonable intrusion by the government, stands "at the very core" of the protections granted by the Fourth Amendment. See Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).

### B. Required "Consent"

█ Valid consent to a search is a well-established exception to the warrant requirement under the Fourth Amendment. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Davis v. United States, 328 U.S. 582, 593–94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). To be valid, however, consent must be freely and voluntarily given. Schneckloth, 412 U.S. at 222, 93 S.Ct. 2041; see also United States v. Sandoval–Vasquez, 435 F.3d 739, 744 (7th Cir. 2006). It must not be obtained through express or implied duress or coercion, or through acquiescence to a wrongful claim of legal authority. See Schneckloth, 412 U.S. at 226–27, 93 S.Ct. 2041; Bumper v. North Carolina, 391 U.S. 543, 548–50, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (consent was invalid when obtained in response to false claim that officer had a search warrant).

█ Section 8(b) requires those subject to the law to consent to searches of their computers, internet-capable devices, and internet use. If they refuse to sign the consent for authorizing the searches and monitoring, they are subject to prosecution for a felony. See Ind.Code § 11–8–8–17. The plaintiffs argue that the "consent" required under section 8(b) does not amount to valid consent under the law. The defendants effectively concede the point, and the

lenges and Third–Party Standing, 113 Harv. L.Rev. 1321, 1336–39,1368–69 (2000); Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L.Rev. 235, 294 (1994). Ayotte v. Planned Parenthood provides a good example, where the Supreme Court reversed a lower court decision completely invalidating a state statute requiring prior parental notification before a minor could obtain an abortion, and remanded the case for consideration of whether a narrower remedy could cure the constitutional flaw. 546 U.S. at 328–30, 126 S.Ct. 961. This case illustrates the Ayotte point well, for the scope of relief depends on the reasoning that leads to the conclusion that any application of section 8(b) to this class of plaintiffs would violate their Fourth Amendment rights.

court agrees.[5] The "consent" required under the statute forces the plaintiffs to choose between allowing access to their personal computers, internet-capable devices, and internet use or facing criminal prosecution. This is no choice at all. The "consent" envisioned in section 8(b) will not serve to legitimize the proposed intrusions.

The defendants suggest that the plaintiffs could choose to avoid searches and monitoring under section 8(b) by choosing not to own a computer or internet-capable device. Def. Br. 6. Of course, a person also could choose not to write letters or use a telephone, and thereby avoid warrantless searches of letters or surveillance of telephone calls. The voluntary use of the mails or telephone lines does not mean the user gives up her rights under the Fourth Amendment, and the same reasoning applies to computer and internet use.

In *United States v. Holm*, 326 F.3d 872, 877–78 (7th Cir.2003), the Seventh Circuit reversed a term of supervised release prohibiting the defendant from all internet use. The court explained that the broad ban on all internet use "renders modern life—in which, for example, the government strongly encourages taxpayers to file their returns electronically, where more and more commerce is conducted on-line, and where vast amounts of government information are communicated via website—exceptionally difficult." *Id.* at 878. In this case, the members of the plaintiff class are no longer under any court supervision. They are entitled to full Fourth Amendment protection, without the lowered expectation of privacy at issue in *Holm.* Reframing the "consent" at issue

here as a forced choice between consenting to broad electronic searches and monitoring, and avoiding technology that is approaching a necessity for modern life, does not validate the consent in the statute. In 2008, that choice is still no choice at all.

## C. *The Scope of Computer and Device Searches*

■■■ Defendants argue that, because section 8(b) has not yet taken effect, the plaintiffs can only speculate about whether the searches and monitoring to which they must consent will amount to a "search" within the meaning of the Fourth Amendment. If the actual intrusions do not rise to that level, the defendants argue that the plaintiffs cannot claim Fourth Amendment protection, and there is no need to determine whether the statute's intrusions are reasonable under the Constitution.

■■■ Defendants point out, for example, that the Fourth Amendment does not apply to installation of a pen register to record the numbers dialed on an individual's phone, *Smith v. Maryland*, 442 U.S. 735, 745–46, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the collection and examination of trash left for pick-up at the curb, *California v. Greenwood*, 486 U.S. 35, 39–41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), and placement of a global positioning system tracking unit underneath a vehicle's bumper, *United States v. Garcia*, 474 F.3d 994, 996–97 (7th Cir.2007). Under the Fourth Amendment, a search does not occur unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable." *Kyllo v. United States*, 533 U.S. 27,

---

**5.** The defendants have not raised any argument that the consent required in section 8(b) is legally valid. At the hearing, counsel for the defendants correctly stated "we're not suggesting, nor do I think anyone would suggest, that a forced consent is anything other than an oxymoron. It's a possibly invalid consent and won't get around the Fourth Amendment concerns."

33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), quoting *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); see also *Bond v. United States,* 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000), citing *Smith,* 442 U.S. at 740, 99 S.Ct. 2577; *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). For a number dialed on a telephone, garbage placed at the curb, and the location of a vehicle, the Supreme Court and Seventh Circuit have reasoned that the information in question is either inherently public or has been disclosed to others, so that there is no reasonable expectation of privacy. Defendants in this case argue by extension that the subjective and objective expectation of privacy in computers, internet-ready devices, and internet use is similarly minimal, and that plaintiffs cannot show that section 8(b) will infringe their Fourth Amendment rights.

The defendants' argument is not persuasive. First, none of the defendants' analogies address the most basic point: Section 8(b) requires plaintiffs to consent to entry into and searches *inside their homes,* and at any time. Section 8(b) therefore forces plaintiffs to consent to the most fundamental sort of intrusion without a warrant or any applicable exception to the warrant requirement of the Fourth Amendment.

Second, the differences among different methods of extracting information from computers and other devices do not address the basic problem here, which is the forced waiver of Fourth Amendment rights. The court recognizes that some computer and internet monitoring techniques have been held not to amount to "searches" within the meaning of the Fourth Amendment, in essence to be comparable to a pen register on a telephone or an examination of the outside of an envelope in the mail. See, *e.g., United States v. Forrester,* 512 F.3d 500, 509–11 (9th Cir. 2008) (government's monitoring of only the "to" and "from" addresses of e-mail messages, the Internet Protocol addresses of the web sites visited, and the total volume of data transmitted to and from an individual's e-mail account was comparable to pen register at issue in *Smith* and was not a search subject to Fourth Amendment); *In re Application for an Order Authorizing use of A Pen Register And Trap On (XXX) Internet Service Account/User Name, (xxxxxxxxx@xxxx.com),* 396 F.Supp.2d 45 (D.Mass.2005) (applying similar analysis to government's application for use of pen registers and trap and trace devices on internet search accounts under 18 U.S.C. § 3122(a)(1)).[6]

Similarly, some courts have found that monitoring of content on public bulletin boards or on widely accessible computer

---

**6.** Although *Forrester* held that computer surveillance techniques that revealed the Internet Protocol [IP] addresses of web sites visited were indistinguishable from a telephone pen register, the court drew a careful line between monitoring IP addresses and monitoring the uniform resource locators ("URLs") of the pages visited:

> A URL, unlike an IP address, identifies the particular document within a website that a person views and thus reveals much more information about the person's Internet activity. For instance, a surveillance technique that captures IP addresses would

show only that a person visited the New York Times' website at http://nytimes.com, whereas a technique that captures URLs would also divulge the particular articles the person viewed.

512 F.3d at 510 n. 6, citing *Pen Register Application,* 396 F.Supp.2d at 49 ("[I]f the user then enters a search phrase [in the Google search engine], that search phrase would appear in the URL after the first forward slash. This would reveal content...."). The Ninth Circuit noted that surveillance of URLs would be "constitutionally problematic." *Id.*

networks does not amount to a search because there is no reasonable expectation of privacy in the content. See, *e.g., United States v. King,* 509 F.3d 1338, 1341–42 (11th Cir.2007) (no Fourth Amendment search had occurred where the claimant had connected to shared military network in which everyone on the network had access to all of his files and was able to observe them, just as the government investigator did); *Guest v. Leis,* 255 F.3d 325, 333, 335–36 (6th Cir.2001) (monitoring of group electronic bulletin boards did not amount to search under Fourth Amendment); *United States v. Stults,* 2007 WL 4284721, *1 (D.Neb. Dec. 3, 2007) (finding that defendant did not have a reasonable expectation of privacy in computer files that were shared with and accessible to all users of a computer network); cf. *Trulock v. Freeh,* 275 F.3d 391, 403 (4th Cir. 2001) (Fourth Amendment rights were violated where FBI searched claimant's password-protected computer files based on his roommate's consent; roommate had authority to consent to the search of shared computer but not of claimant's password-protected files); *United States v. Buckner,* 407 F.Supp.2d 777, 779–81 (W.D.Va.2006) (defendant had a reasonable expectation of privacy in password-protected computer files, but search was valid because defendant's wife had a legitimate, substantial interest in all aspects of the computer sufficient to validate her unrestricted consent to search); *United States v. Barth,* 26 F.Supp.2d 929, 936–37 (W.D.Tex.1998) (defendant manifested a reasonable expectation of privacy in data placed in files on his hard drive and did not waive Fourth Amendment protection by granting limited access to computer repair person). If monitoring does not invade genuine private content, then there may be no search subject to the Fourth Amendment. The plaintiffs and this court should wait, say defendants, to see if they actually conduct searches subject to Fourth Amendment scrutiny.

■ The problem with this argument is that if the defendants' intended monitoring of the plaintiffs' computers and internet use would *not* amount to a search under the Fourth Amendment, then the defendants do not need section 8(b) or the plaintiffs' consent at all. Section 8(b) would be a nullity. Section 8(b) would have effect only if law enforcement officials intend to carry out searches that would require a search warrant, but for the supposed "consent" under section 8(b). Courts presume that statutory provisions are intended to have effect and are not superfluous. *E.g., Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

An additional problem with defendants' argument is that the text of section 8(b) imposes no limits on the types or scope of searches of plaintiffs' computers and internet use. The court appreciates that a state court might construe a statute narrowly to avoid constitutional problems. See, *e.g., A Woman's Choice–East Side Women's Clinic v. Newman,* 671 N.E.2d 104, 110 (Ind.1996) (answering certified question by construing statute to cure constitutional flaw); see generally *Salinas v. United States,* 522 U.S. 52, 59–60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (statutes should be construed to avoid constitutional questions, "but this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature"), quoting *United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). But to avoid the constitutional problem in section 8(b), a court would need to construe it to apply only to activities that do not amount to Fourth Amendment searches, which would reduce section 8(b) to a nullity for the reasons explained just above.

In the meantime, of course, the plaintiffs are being told, under penalty of criminal prosecution, that they must give unlimited consent to any type of computer searches and internet monitoring that the defendants care to try, and that they must allow law enforcement authorities to enter their homes at any time to carry out the work. The result is the unconstitutional chilling of and intrusion upon plaintiffs' privacy and security at home, and in their papers and effects.[7]

 Defendants also argue that section 8(b) is only a logical extension of felons' loss of certain freedoms. Sex and violent offenders may be required to register information about their whereabouts and to submit DNA samples. See *Smith v. Doe*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (upholding registry against *ex post facto* challenge); *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003) (upholding registry against procedural due process challenge); *Green v. Berge*, 354 F.3d 675 (2004) (affirming dismissal, and upholding Wisconsin law requiring felons to submit DNA sample against Fourth Amendment challenge be-

cause obtaining reliable proof of felon's identity was a special need). Felons also may be prohibited from possessing guns, voting, and holding certain professional positions. See *Richardson v. Ramirez*, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (upholding against equal protection challenge California constitutional provision disenfranchising felons); *De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (upholding against supremacy, due process, and *ex post facto* challenges New York statute prohibiting unions from hiring some felons to collect money on behalf of the unions); *Hawker v. New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (upholding New York statute prohibiting felons from practicing medicine against *ex post facto* challenge); *United States v. Jester*, 139 F.3d 1168, 1171 (7th Cir.1998) (upholding federal law criminalizing felons' possession of guns against cruel and unusual punishment and equal protection challenges, and recognizing that gun possession is not a fundamental right); see generally *Conn v. Gabbert*, 526 U.S. 286, 291–92, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) ("In a line of earlier cases, this Court has indicated that the liberty component of the Fourteenth

---

7. Cases involving computer searches or internet monitoring of persons subject to continued court supervision (parole or probation), or searches of computers on an employer's network, have little relevance here because the expectations of privacy are reduced so much in both contexts. See, *e.g., United States v. Herndon*, 501 F.3d 683, 687–92 (6th Cir.2007) (no violation of Fourth Amendment when probationer consented to computer and internet searches as term of probation and probationers enjoyed drastically reduced privacy interest); *United States v. Yuknavich*, 419 F.3d 1302, 1308–11 (11th Cir.2005) (probationer's home computer was subject to warrantless search based on reasonable suspicion); *United States v. Lifshitz*, 369 F.3d 173, 190–93 (2d Cir.2004) (special needs of probation system justified monitoring of computer with probationer's consent); *United States v.*

*Angevine*, 281 F.3d 1130, 1134–35 (10th Cir. 2002) (employee did not have reasonable expectation of privacy in files downloaded to employer's computer); *United States v. Ziegler*, 474 F.3d 1184, 1188–91 (9th Cir.2007) (employee had reasonable expectation of privacy in workspace and computer contents, but employer could give valid consent to search); *Biby v. Board of Regents*, 419 F.3d 845, 850–51 (8th Cir.2005) (employee had no reasonable expectation of privacy in workplace computer where employer had notified employees that computers could be searched to respond to discovery requests in civil litigation); *Muick v. Glenayre Elec.*, 280 F.3d 741, 743 (7th Cir.2002) (no reasonable expectation of privacy in workplace computer files where employer had announced that it could inspect the computer).

Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation.").

 The defense attempt to extend these cases to authorize section 8(b) is not persuasive. In section 8(b), the Indiana legislature has gone further and has taken an unprecedented step in stripping plaintiffs of their right to be secure in their homes, "papers," and personal effects. Unlike registering public information or working in particular professions, the right to privacy in one's home and personal effects is fundamental. See *Ker v. California,* 374 U.S. 23, 32, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) ("Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. That safeguard has been declared to be as of the very essence of constitutional liberty the guaranty of which is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen.") (internal quotation marks omitted); *Byars v. United States,* 273 U.S. 28, 33, 47 S.Ct. 248, 71 L.Ed. 520 (1927) ("The Fourth Amendment was adopted in view of long misuse of power in the matter of searches and seizures both in England and the colonies; and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods...."). A person's status as a felon who is no longer under any form of punitive supervision therefore does not permit the government to search his home and belongings without a warrant.

## VI. *The State's "Special Needs" Argument*

"[I]t is settled for purposes of the Amendment that 'except in certain careful-

ly defined classes of cases', a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Mancusi v. DeForte,* 392 U.S. 364, 370, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), quoting *Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). There is no warrant and no valid consent here, so the defendants must show that searches authorized by section 8(b) fall into a carefully defined class of cases for which a warrant or consent is not necessary.

Defendants argue that the searches authorized by section 8(b) require no warrant because they serve a "special need" other than law enforcement. Defendants argue that sex crimes are a "serious threat in this Nation," *Connecticut Department of Public Safety v. Doe,* 538 U.S. 1, 4, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003), and that Indiana has a "special need" to conduct suspicionless searches of sex offenders' internet-capable computers and telephones at any time in order to protect the public.

 As would be true in any cases dealing with serious crimes, it is easy to sympathize with the defendants' argument. Although most sex crimes and violent crimes are prosecuted in state courts, federal courts see enough of them to recognize the dangers they pose. The defendants' argument, however, loses sight of the boundaries of the special needs exception to the Fourth Amendment: the law's primary purpose cannot be "to uncover evidence of ordinary criminal wrongdoing." *City of Indianapolis v. Edmond,* 531 U.S. 32, 42, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). A "general interest in crime control" within the general population, as embodied here in section 8(b), will not justify either a diminution or an outright invasion of the privacy protected by the Fourth Amendment. *Id.* at 41, 121 S.Ct. 447.

The Supreme Court's discussion of a special needs exception began with searches by public school officials of students and their personal belongings. See *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (finding that a school official's warrantless search of a student's purse did not violate the Fourth Amendment because the official had a reasonable suspicion that the student had violated a school rule). In his concurrence, Justice Blackmun argued that a balancing of privacy and governmental interests could replace the Fourth Amendment's warrant and probable cause requirements only "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* at 351, 105 S.Ct. 733.

■■■ Since *T.L.O.*, the Court has adopted Justice Blackmun's formulation of a "special needs" exception and has recognized some other exceptional circumstances justifying this substitution under varying conditions. Certain employees in trusted public positions and some student populations may be tested for drugs without any individualized suspicion of drug use. See *Board of Education v. Earls*, 536 U.S. 822, 833–34, 841, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (using balancing test to approve random drug testing of students in competitive extracurricular activities where the only result of a positive test was to bar participation in the activity, and the policy preserved non-participation as an option for conscientious objectors); *Vernonia School District 47J v. Acton*, 515 U.S. 646, 665, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (using balancing test to approve random drug testing of student athletes in light of "the government's responsibilities, under a public school system, as guardian and tutor of

children entrusted to its care"); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 674, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (using balancing test to approve suspicionless drug testing of customs officials because of the "extraordinary safety and national security hazards" peculiar to their positions and their routine handling of controlled substances and their practice of carrying firearms); *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 619–20, 627, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (using balancing test to approve suspicionless drug and alcohol testing of railroad employees because they are charged with protecting life and property and voluntarily participate in a heavily regulated industry); cf. *Chandler v. Miller*, 520 U.S. 305, 321–22, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (rejecting suspicionless drug testing of candidates for state office as special need where asserted need was primarily symbolic in displaying the state's "commitment to the struggle against drug abuse"). Government employers may conduct reasonable warrantless, work-related searches or investigatory searches of employee offices based on individualized suspicion of misconduct. See *O'Connor v. Ortega*, 480 U.S. 709, 719–26, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion of O'Connor, J.) (using balancing test to find that such searches can be reasonable); *id.* at 732, 107 S.Ct. 1492 (Scalia, J., concurring in judgment) (government employment presents "special need" that can authorize work-related searches of workspace).

■■ Government officials also may search the homes of probationers pursuant to enumerated regulations and based on only reasonable suspicion. See *Griffin v. Wisconsin*, 483 U.S. 868, 874, 880, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (observing that because probation is a form of

criminal punishment instituted according to constitutional requirements, during that punitive period, probationers enjoy only a conditional liberty). The Court has also upheld, in a limited fashion, temporary sobriety checkpoints on public highways. See *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 451–52, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (using balancing test to approve generally sobriety checkpoints limited to brief questioning and observation because of the state's "interest in preventing drunken driving"); see also *United States v. Martinez–Fuerte*, 428 U.S. 543, 558–59, 562, 566–67, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (using balancing test, before the advent of the special needs exception, to approve suspicionless stops limited to brief questioning and observation at "reasonably located" permanent border checkpoints).

The Supreme Court has never substituted a balancing test for the warrant and probable cause requirements where the primary justification for the policy was to make it easier to detect criminal activity. See *Ferguson v. City of Charleston*, 532 U.S. 67, 79–86, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001); *Edmond*, 531 U.S. at 41–42, 121 S.Ct. 447; *T.L.O.*, 469 U.S. at 351, 105 S.Ct. 733 (Blackmun, J., concurring). The Fourth Amendment explicitly protects the "rights of the people to be secure in their persons, houses, papers, and effects" from unreasonable searches and seizures. "This restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion." *Chandler*, 520 U.S. at 308, 117 S.Ct. 1295. Certain exceptions to this general rule exist, including those discussed above. But when the government's chief purpose in dispensing with constitutional protections is simply to make it easier to detect and punish crime, even serious crime, the Fourth Amendment forecloses such efforts.

In *Edmond*, the City of Indianapolis had created a vehicle checkpoint program designed to catch drug users and traffickers. At each checkpoint, an officer approached every car and asked for the driver's license and vehicle registration. During this interaction, the officer looked for signs of impairment and also looked into the car for evidence of criminal activity in plain view. A drug-sniffing dog also circled each car. More intrusive searches or seizures required particularized suspicion. Out of 1,161 vehicles stopped, police arrested fifty-five people for drug-related crimes and another forty-nine people for offenses unrelated to drugs. In finding that the Fourth Amendment prohibited such checkpoints, the *Edmond* Court distinguished the law enforcement purpose of the Indianapolis checkpoints from the unique needs of the limited permanent border and sobriety checkpoints approved in *Martinez–Fuerte* and *Sitz*:

> Securing the border and apprehending drunk drivers are, of course, law enforcement activities, and law enforcement officers employ arrests and criminal prosecutions in pursuit of these goals. See *Sitz*, 496 U.S. at 447, 110 S.Ct. 2481; *Martinez–Fuerte*, 428 U.S. at 545–550, 96 S.Ct. 3074. If we were to rest the case at this high level of generality, there would be little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose. Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life.

531 U.S. at 42, 121 S.Ct. 447. Responding to Indianapolis' argument that "the severe and intractable nature of the drug problem" warranted extreme measures, the

*Edmond* Court recognized that serious crimes such as drug trafficking caused "social harms of the first magnitude." *Id.* The nature of the particular crime at issue did not, however, justify dispensing with the Fourth Amendment's requirement of individualized suspicion:

> The same can be said of various other illegal activities, if only to a lesser degree. But the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose. Rather, in determining whether individualized suspicion is required, we must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue. We are particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends.

*Id.* at 42–43, 121 S.Ct. 447.

In *Ferguson,* the Court invalidated another policy designed to deter a perceived "national epidemic": pregnant women using cocaine. 532 U.S. at 70 n. 1, 121 S.Ct. 1281. In conjunction with a local hospital, the City of Charleston developed a policy to test pregnant women for cocaine use. If a woman tested positive during her pregnancy, the policy required a second test. If the second test revealed cocaine use, the hospital reported the woman to the police for arrest. The hospital also reported women to the police who tested positive during their pregnancies and missed an appointment with a drug abuse counselor. If a woman tested positive after delivery, the hospital immediately notified the police. The city later amended the policy to give women who tested positive during labor an option of avoiding arrest by consenting to substance abuse treatment.

Despite Charleston's asserted purpose of protecting the health of mothers and their children, "the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment." *Id.* at 80, 121 S.Ct. 1281. While the threat of criminal sanctions may have "ultimately been intended as a means to an end," the policy's primary purpose was to "ensure the use of those means." *Id.* at 83–84, 121 S.Ct. 1281. Relying heavily on *Edmond,* the *Ferguson* Court found that absent the women's valid consent, the policy violated the Fourth Amendment's general prohibition against suspicionless searches. While the policy's ultimate purpose was protection from social harms, the policy's primary purpose was using law enforcement to eradicate those social harms. *Id.* at 85–86, 121 S.Ct. 1281.

The Supreme Court's "special needs" cases admittedly seem to invite extension. It is not difficult to characterize any need as special, so as to make law enforcement easier with respect to particular categories of crimes. But if the motive for extending the doctrine is to detect and eradicate crime, then there is no limit to the special needs exception, and the exception will easily expand to replace the Fourth Amendment itself. That is why a special needs exception cannot be based on the ordinary and important law enforcement purpose of reducing crime. See *Ferguson,* 532 U.S. at 82–83, 121 S.Ct. 1281; *Edmond,* 531 U.S. at 41–44, 121 S.Ct. 447; *Richards v. Wisconsin,* 520 U.S. 385, 392, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) (rejecting Wisconsin's argument that the knock-and-announce rule permitted exemption for felony drug investigations, and observing that if *per se* exception based on "special circumstances of today's drug cul-

ture" was "allowed for each category of criminal investigation that included a considerable—albeit hypothetical—risk of danger to officers or destruction of evidence, the knock-and-announce element of the Fourth Amendment's reasonableness requirement would be meaningless"); *Torres v. Puerto Rico*, 442 U.S. 465, 473–74, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979) (rejecting suspicionless search of traveler's baggage based on law authorizing searches of all American cargo and passengers, and refusing to dispense "with the fundamental Fourth Amendment prohibition against unreasonable searches and seizures simply because of a generalized urgency of law enforcement"); *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Douglas, J., concurring) (observing that the Fourth Amendment does not distinguish between types of crimes "because a particular crime seems particularly heinous").[8] To extend the doctrine that far would effectively nullify the Fourth Amendment.

■ The heart of defendants' special needs argument here is that sex crimes are "a serious threat in this Nation," see *Connecticut Department of Public Safety*, 538 U.S. at 4, 123 S.Ct. 1160 (approving sex offender registry against due process challenge), and thus warrant this unprecedented action. The court agrees with the premise but must disagree with the conclusion. As heinous as sex and violent crimes are, many other crimes are also threats to our Nation. The social contract reflected in our Constitution imposes limits on law enforcement to protect liberty and privacy. Americans invest a significant portion of public resources to promote social peace and safety. But our founders drew a clear line, based on observed and experienced abuses, on the government's ability to invade fundamentally personal areas. To enter the homes of or to search the personal effects, papers, and bodies of persons in the general population, public officials must have cause to believe that they will find evidence of a crime. It is almost always possible to characterize the Fourth Amendment as an inconvenience to law enforcement officials as they carry out their vital duties. That inconvenience, however, is one of the fundamental protections that separates the United States of America from totalitarian regimes. The right to feel safe and secure in one's own home, person, and belongings is central to our way of life.[9]

---

8. Section 8(b) also applies to those convicted of murder and voluntary manslaughter who must register as violent offenders under sections 11–8–8–5 and 11–8–8–7. This inclusion supports the point that the defendants' asserted special need of protecting children and others from sexual predators is not a limited need.

9. The fact that section 8(b) does not specify who would be authorized to conduct the searches does not affect the special needs analysis or the larger conclusion that section 8(b) violates these plaintiffs' Fourth Amendment rights. The sex and violent offender registry is administered and enforced by law enforcement and correction officials. Searches for evidence of criminal activity are an essential part of a state's police powers. That work cannot be delegated to private par-

ties in an attempt to avoid responsibility for state action. See generally *Griffin v. Maryland*, 378 U.S. 130, 135, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964) (finding that special deputy was state actor because if "an individual is possessed of state authority and purports to act under that authority, his action is state action"); *Nixon v. Condon*, 286 U.S. 73, 88, 52 S.Ct. 484, 76 L.Ed. 984 (1932) ("when those agencies are invested with authority independent of the will of the association in whose name they undertake to speak, they become to that extent the organs of the state itself, the repositories of official power"); *United States v. Hoffman*, 498 F.2d 879, 881 (7th Cir.1974) (affirming criminal convictions, and finding that special railway police officers were state actors because they were "authorized on a continuing and full-time ba-

*Conclusion*

Section 8(b), however well intentioned, seeks to achieve law enforcement goals with means that violate the Fourth Amendment, at least as applied to the plaintiff class, offenders who have completed their criminal sentences and who are no longer under any form of parole, probation, or other court supervision. These plaintiffs have rights under the Fourth Amendment. The State may not force them to waive those rights under threat of criminal prosecution for failing or refusing to do so. Final declaratory relief should be sufficient here, in a case brought as a Rule 23(b)(2) class action against all prosecuting attorneys in Indiana, to protect the plaintiffs' Fourth Amendment rights. The court does not see a need at this time for the somewhat more intrusive relief of a permanent injunction. See generally *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 503 (7th Cir.1991) (comparing declaratory and injunctive relief); see also 28 U.S.C. § 2202 (authorizing further "necessary or proper relief" based on declaratory judgment); *Pro–Eco, Inc. v. Board of Commissioners of Jay County*, 57 F.3d 505 (7th Cir.1995) (affirming denial of damages for plaintiff after original declaratory judgment had sufficed to prevent enforcement of invalid ordinance). The court will enter a final declaratory judgment stating that the newly enacted Indiana Code § 11–8–8–8(b) may not be applied to members of the plaintiff class.

So ordered.

sis to search actively for criminals and trespassers and to use the powers of the state when their search is successful"). Whoever might be designated to conduct searches and to monitor internet use under section 8(b) would be a state actor.